AO 106 (Rev. 06/09)  Application for a Search Warrant

FILED

JAN 2 8 2020

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

In the Matter of the Search of                     )
*(Briefly describe the property to be searched*    )
*or identify the person by name and address)*      )     Case No.
One Apple iPhone                                    )
Stored under FP&F No. 2020-2504-000-281            )     20MJ0363
TARGET DEVICE (2)                                  )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is incorporated by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, U.S.C., §§ 952 & 960 | Importation of a Controlled Substance (Methamphetamine) |

The application is based on these facts:

See  Affidavit of Special Agent Greg Pettigrew, which is hereby incorporated by reference and made part hereof.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Greg Pettigrew, H.S.I. Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 1/28/2020

_____
*Judge's signature*

City and state:   San Diego, California

HON. BARBARA L. MAJOR, MAGISTRATE JUDGE
*Printed name and title*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| IN THE MATTER OF THE SEARCH OF | **AFFIDAVIT OF SPECIAL AGENT GREG PETTIGREW IN SUPPORT OF A SEARCH WARRANT** |
|---|---|
| (1) One Apple iPhone, Stored under FP&F No. 2020-2504-000-281, **Target Device** | |

I, Special Agent Greg Pettigrew, having been duly sworn, declare and state as follows:

## I
## <u>INTRODUCTION</u>

1.   I make this affidavit in support of an application for a warrant to search the following electronic device:

> Apple iPhone
> Stored under FP&F No. 2020-2504-000-281
> **Target Device**

and seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 952, 960, and 963, Unlawful Importation of a Controlled Substance (and Conspiracy to do the same); Title 18, United States Code, Section 2, Aiding and Abetting the Unlawful Importation of a Controlled Substance; Title 21, United States Code, Sections 841 and 846, Distribution and Possession with Intent to Distribute Controlled Substances (and Conspiracy to do the same) and Title 21, United States Code, Section 843(b), Unlawful Use of a Communication Facility (the **Target Offenses**).

2.   The **Target Device** was seized from **CARLOS EDUARDO TOPETE** ("Defendant") at the time of his arrest for Importation of Methamphetamine on October

31, 2019, at the San Ysidro Port of Entry. The **Target Device** was found in Defendant's vehicle at the time of his arrest. The **Target Device** is currently in the evidence vault located at 9495 Customhouse Plaza, San Diego, CA 92154.

3.     The search of the **Target Device** supports an investigation and prosecution of Defendant for the Target Offenses. Based on the information below, there is probable cause to believe that a search of the **Target Device**, as described in Attachment A, will produce evidence of the Target Offenses, as described in Attachment B.

4.     The following is based upon my experience and training, investigation, and consultation with other law enforcement agents and officers experienced in narcotics violations, including the Target Offenses. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because I make this affidavit for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only sets forth those facts believed to be necessary to establish probable cause. Dates and times are approximate, and refer to Pacific Standard Time (PST) unless otherwise specified.

5.     I am a Special Agent for the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"). I have been employed as a special agent since July 2017. I am a graduate of a 27-week criminal investigator training program at the Federal Law Enforcement Training Center in Glynco, Georgia.

6.     I am a Federal Law Enforcement Officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and I am authorized by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I am authorized under Rule 41(a) to make applications for search and seizure warrants.

7.     During my tenure with HSI, I have participated in the investigation of numerous Drug Trafficking Organizations ("DTOs"), which have resulted in the issuance

of search warrants, the seizure of narcotics, weapons, and currency, and the indictment and arrest of persons.

8.　I am familiar with narcotics traffickers' methods of operation including the distribution, storage, and transportation of narcotics and the collection of money proceeds of narcotics trafficking and methods of money laundering used to conceal the nature of the proceeds.　I have had training in investigations regarding the unlawful importation, possession, and distribution of controlled substances, as well as conspiracies associated with criminal narcotics, in violation of Title 21, United States Code, Sections 952, 960 and 963.

9.　Through the course of my training, investigations, and conversations with other law enforcement personnel, I have learned that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones, pagers, and portable radios to maintain communications with co-conspirators in order to further their criminal activities.　Conspiracies involved in the smuggling and trafficking of narcotics generate many types of evidence including, but not limited to, cellular phone-related evidence such as voice-mail messages referring to the arrangements of travel and payment, names, photographs, text messaging, and phone numbers of co-conspirators.　Typically, load drivers smuggling narcotics across the border from Mexico into the United States are in telephonic contact with co-conspirators immediately prior to and following the crossing of the load vehicle, at which time they receive instructions on where and when to deliver the controlled substances.

10.　Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

a.　Drug traffickers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

b.　Drug traffickers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

c.   Drug traffickers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

d.   Drug traffickers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

e.   Drug traffickers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

f.   Drug traffickers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

g.   The use of cellular telephones and other mobile communication devices by conspirators or drug traffickers tends to generate evidence that is stored on the device, including, but not limited to emails, text messages, photographs, audio files, videos, call logs, address book entries, IP addresses, social network data, and location data.

11.   Subscriber Identity Module (SIM) Cards are smart cards that store data for cellular telephone subscribers.  Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages.  Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that device.

12.   Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones can and often do contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack

1   space, and temporary or permanent files contained on or in the cellular/mobile telephone.

2   Specifically, based upon my training, education, and experience investigating these

3   conspiracies, I have learned that searches of cellular/mobile telephones and/or other

4   mobile communication devices yields evidence:

5           a.      tending to indicate efforts to import methamphetamine, or other

6   federally controlled substances from Mexico into the United States, and to distribute

7   methamphetamine or other federally controlled substances within the United States;

8           b.      tending to identify accounts, facilities, storage devices, and/or services

9   – such as email addresses, IP addresses, and phone numbers – used to facilitate the

10  importation of methamphetamine, or other federally controlled substances, from Mexico

11  into the United States, and the distribution of methamphetamine, or other federally

12  controlled substances, within the United States;

13          c.      tending to identify co-conspirators, criminal associates, or others

14  involved in the importation of methamphetamine, or other federally controlled substances,

15  from Mexico into the United States, and the distribution of methamphetamine, or other

16  federally controlled substances, within the United States;

17          d.      tending to identify travel to or presence at locations involved in the

18  importation of methamphetamine, or other federally controlled substances from Mexico

19  into the United States, and the distribution of methamphetamine, or other federally

20  controlled substances, within the United States;

21          e.      tending to identify the user of, or persons with control over or access

22  to, the **Target Device**; and/or

23          f.      tending to place in context, identify the creator or recipient of, or

24  establish the time of creation or receipt of communications, records, or data involved in the

25  activities described above.

26  / / /

27  / / /

28  / / /

5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II

## STATEMENT OF PROBABLE CAUSE

13.    Defendant **CARLOS EDUARDO TOPETE** ("Defendant") is a United States citizen born on July 14, 1983 (36 years old). Prior to the charged offense, Defendant resided in Tijuana, Baja California, Mexico.

14.    On Thursday morning, October 31, 2019, at approximately 8:10 a.m., Defendant drove to the San Ysidro Port of Entry in his silver 1999 Ford Taurus four-door sedan bearing California license plate number 4FVD809. A D.M.V. registration card located inside the Ford Taurus listed Defendant as its current registered owner. The registration document stated that it was valid to May 8, 2020.

15.    Defendant drove his Ford Taurus to Vehicle Lane-25 at the San Ysidro Port of Entry. As Defendant waited in line, CBP Canine Enforcement Officer Sudaria walked with his narcotics detector dog near the Ford Taurus. Once closer to the car, Officer Sudaria observed that his dog alerted to the Taurus' rear bumper.

16.    The officer looked under the bumper and saw a non-factory compartment. Since the officer was with his narcotics dog, he requested assistance. CBP Officer Hernandez responded to Lane-25 in the pre-primary area and approached Defendant.

17.    Officer Hernandez asked Defendant a few routine inspection-related questions to which the Defendant responded:

· He was driving to Otay Mesa.

· He was going to work at "Fed Ex."

· He was not bringing anything from Mexico.

· He was the registered owner of the Ford Taurus.

· He had owned the car for a few months.

· He lived in Tijuana, Mexico.

· He was a United States citizen.

/ / /

/ / /

6

18.   During his encounter with Defendant, Officer Hernandez noticed that Defendant wore a jacket and a long sleeve shirt with both bearing "Fed Ex" logos

19.   The officer then turned his attention to the Ford Taurus.  He used an extended-mirror inspection device to look under the rear bumper.  With the use of the mirror, Officer Hernandez observed a non-factory compartment under the rear bumper.  The officer inspected further and utilized a density-reading device on the rear bumper.  The device produced a high-density reading.  At this point, officers took the Defendant to the secondary security office and drove his car to the secondary inspection lot.

20.   Officers drove Defendant's Ford Taurus to the Z-Portal X-ray machine in the vehicle secondary inspection lot.  The Z-Portal operator that morning, CBP Officer Labidou, examined the scan of the car.  The officer noticed anomalies in the Ford Taurus' rear bumper and both rear doors.

21.   CBP Officer Gonzales became aware of the Z-Portal observations and conducted a full intensive inspection of the Ford Taurus.  After a thorough search of the car, Officer Gonzales removed 96 vacuum-sealed packages that contained a substance that field-tested positive for and appeared to be methamphetamine.

22.   Below is a breakdown of the number and location of the 96 packages recovered:

· 18: Rear door, driver side.

· 18: Rear door, passenger side.

· 11: Front door, passenger side.

· 49: Rear bumper.

The gross weight of the suspected methamphetamine was 58.20 kilograms.  Officers formally arrested the Defendant.

23.   At approximately 10:15 a.m., I, Homeland Security Investigations Special Agent Greg Pettigrew, advised Defendant in Spanish of his Miranda rights.  Special Agent Hutchison witnessed this.  Defendant told me that he understood his rights and agreed to waive them

24.     Defendant denied knowledge of the methamphetamine found in his car. However, Defendant admitted that an individual named Claudia Solis offered him $3,000.00 to smuggle drugs into the United States. Solis told him that he would drive the car into the U.S. and park it at the FedEx facility where Defendant works. Then, Defendant would call a man named Enrique Perez. Defendant did not agree to smuggle drugs.

25.     In recounting the events prior to his crossing, Defendant told me that, earlier in the week, Ms. Solis borrowed his car and returned it to him the previous evening at about 11:00 p.m.

26.     The Treasury Enforcement Communication System ("T.E.C.S.") recorded Defendant's presence in the Ford Taurus on thirteen prior crossings into the United States from September 14, 2019 through October 30, 2019 (the day before his arrest). During that period, the Ford Taurus had crossed into the U.S. on fifteen occasions. Defendant's crossings in the Ford Taurus also included the six consecutive crossings immediately preceding his arrest.

27.     The packages weighed a total of approximately 58.20 kilograms (32.89 pounds). Defendant was charged with violating Title 21, United States Code, Sections 952 and 960 (Importation of a Controlled Substance). The **Target Device** was seized incident to his arrest.[1]

28.     Based on my experience investigating narcotics smugglers, Defendant may have used the **Target Devices** to coordinate with the other parties involved regarding the importation of methamphetamine. I believe that recent calls made and received, telephone numbers, contact names, electronic mail (email) addresses, appointment dates, text messages, email messages, messages and posts from social networking sites, pictures, and other digital information may be stored in the memory of the **Target Device**. This data may include information that is relevant to Defendant's narcotics trafficking activities, including identifying other persons involved in their narcotics trafficking activities.

---

[1] Agents were only able to obtain a fraction of the information from the **Target Device**. This information is provided for purposes of full disclosure, but for the purpose of determining whether there is probable cause to authorize the requested search and seizure warrant I ask that the Court not consider this information.

1    29.    Drug trafficking conspiracies require intricate planning and coordination. This

2  often occurs days, weeks, or even months prior to the actual importation of the drugs into

3  the United States.  All parties involved communicate with one another in efforts to ensure

4  success in getting their valuable cargo to its destination within the United States.

5                                                    **III**

6                                        **METHODOLOGY**

7    30.    It is not possible to determine, merely by knowing the cellular telephone's

8  make, model and serial number, the nature and types of services to which the device is

9  subscribed and the nature of the data stored on the device.  Cellular devices today can be

10  simple cellular telephones and text message devices, can include cameras, can serve as

11  personal digital assistants and have functions such as calendars and full address books and

12  can be mini-computers allowing for electronic mail services, web services and rudimentary

13  word processing.  An increasing number of cellular service providers now allow for their

14  subscribers to access their device over the internet and remotely destroy all of the data

15  contained on the device.  For that reason, the device may only be powered in a secure

16  environment or, if possible, started in "flight mode," which disables access to the network.

17  Unlike typical computers, many cellular telephones do not have hard drives or hard drive

18  equivalents and store information in volatile memory within the device or in memory cards

19  inserted into the device. Current technology provides some solutions for acquiring some of

20  the data stored in some cellular telephone models using forensic hardware and software.

21  Even if some of the stored information on the device may be acquired forensically, not all

22  of the data subject to seizure may be so acquired. For devices that are not subject to forensic

23  data acquisition or that have potentially relevant data stored that is not subject to such

24  acquisition, the examiner must inspect the device manually and record the process and the

25  results using digital photography. This process is time and labor intensive and may take

26  weeks or longer.

27    31.    Following the issuance of this warrant, I will collect the **Target Device** and

28  subject it to analysis. All forensic analysis of the data contained within the **Target Device**

1  and memory card(s) will employ search protocols directed exclusively to the identification
2  and extraction of data within the scope of this warrant.

3      32.   Based on the foregoing, identifying and extracting data subject to seizure
4  pursuant to this warrant may require a range of data analysis techniques, including manual
5  review, and, consequently, may take weeks or months. The personnel conducting the
6  identification and extraction of data will complete the analysis within ninety (90) days of
7  the date the warrant is signed, absent further application to this court.

8                                      **IV**
9                                  **CONCLUSION**

10     33.   Based on all of the facts and circumstances described above, my training and
11  experience, and consultations with other law enforcement officers, there is probable cause
12  to conclude that Defendant utilized the **Target Device** to facilitate the commission of the
13  Target Offenses.

14     34.   Further, based on the Defendant's border crossings in the Ford Taurus
15  beginning on September 14, 2019, probable cause exists to believe that evidence of the
16  aforementioned offenses exists on the **Target Device** for the period of September 13, 2019
17  through October 31, 2019.

18     35.   Because the **Target Device** were promptly seized during the investigation of
19  Defendant's drug trafficking activities and has been securely stored, there is probable cause
20  to believe that evidence of illegal activity committed by Defendant continues to exist on
21  the **Target Device**.

22  / / /
23  / / /
24  / / /
25  / / /
26  / / /
27  / / /
28  / / /

1      36.    Based upon my experience and training, consultation with other agents in

2 narcotics investigations, consultation with other sources of information, and the facts set

3 forth herein, I believe that the items to be seized set forth in Attachment B (incorporated

4 herein) are likely to be found in the property to be searched described in Attachment A

5 (incorporated herein).  Therefore, I respectfully request that the Court issue a warrant

6 authorizing me, or another federal law enforcement agent specially trained in digital

7 evidence recovery, to search the items described in Attachment A, and seize the items listed

8 in Attachment B.

9      I declare under penalty of perjury that the foregoing is true and correct to the best of

10 my knowledge and belief.

11                                    _____

                                      Special Agent Greg Pettigrew

12                                       Homeland Security Investigations

13

     Sworn to and subscribed before me this ____28th____ day of January, 2020.

14

15

16

17 HONORABLE BARBARA L. MAJOR

UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28

## **ATTACHMENT A**

### **DESCRIPTION OF PROPERTY TO BE SEARCHED**

The property to be searched is described as:

**Target Device**

Make:    Apple

Model:   iPhone

Owner:   Carlos Eduardo TOPETE

FP&F No. 2020-2504-000-281

Presently in the custody of Homeland Security Investigations, located at 9495 Customhouse Plaza, San Diego, CA 92154.

## ATTACHMENT B

Authorization to search **Target Device** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in **Target Device** for evidence described below. The search of **Target Device** will be conducted in accordance with the procedures for electronically stored information protocol in the supporting affidavit.

The evidence to be seized from the cellular/mobile telephone will be electronic records, communications, and data such as emails, text messages, chats, and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of September 13, 2019 through October 31, 2019:

a.  tending to indicate efforts to import methamphetamine, or other federally controlled substances from Mexico into the United States, and to distribute methamphetamine or other federally controlled substances within the United States;

b.  tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate the importation of methamphetamine, or other federally controlled substances, from Mexico into the United States, and the distribution of methamphetamine, or other federally controlled substances, within the United States;

c.  tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine, or other federally controlled substances, from Mexico into the United States, and the distribution of methamphetamine, or other federally controlled substances, within the United States;

d.  tending to identify travel to or presence at locations involved in the importation of methamphetamine, or other federally controlled substances from Mexico into the United States, and the distribution of methamphetamine, or other federally controlled substances, within the United States;

e.  tending to identify the user of, or persons with control over or access to, **Target Device**; and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of the Target Offenses.